# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| S100, INC.,<br>*d/b/a Sold 100 Real Estate*,<br><br>    Plaintiff,<br><br>v.<br><br>JOEL OGE ODILI,<br><br>    Defendant. | Civil Action No. TDC-22-0411 |

## MEMORANDUM OPINION

Plaintiff S100, Inc. ("S100") has filed suit against Defendant Joel Oge Odili for breach of contract and unjust enrichment arising out of a property management agreement. Pending before the Court is Odili's Motion to Dismiss. Having reviewed the briefs and submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On or about June 15, 2012, S100, a Maryland corporation, and Odili, a resident of the Republic of Nigeria, entered into a Property Management and Exclusive Rental Agreement (the "Agreement"). The Agreement provided terms under which S100 was to rent and manage a parcel of real property owned by Odili and located on Durham Way in Hanover, Maryland ("the Property"). As relevant here, the Agreement included provisions relating to the required rent amount and lease terms, a requirement that S100 list the Property and advertise it for rent, leasing and management fees to be paid to S100, and the conduct of maintenance on the Property.

In the Complaint, S100 alleges that in April 2019, while the Property was being marketed for rent, Odili authorized S100 to perform certain renovations. S100 advanced the funds for the renovations and performed them, but Odili refused to reimburse S100 for those costs, which amounted to $23,456.61. In the same time frame, S100 secured a tenant to rent the renovated property for $7,500 per month, which was more than the amount set in the Agreement, but Odili refused to execute a lease for the renovated property with the tenant procured by S100, in violation of the terms of the Agreement.

On September 21, 2021, S100 filed the present action in the Circuit Court for Prince George's County, Maryland, alleging breach of contract (Count 1) and unjust enrichment (Count 2) based on Odili's failure to pay to S100 (1) $23,456.61 in renovation costs incurred by S100; (2) interest in the amount of $175,924.50 accruing on the unpaid renovation funds; (3) a leasing fee of $7,500, or one month's rent, for finding a tenant; (4) $21,600 in management fees for the time period during which a lease with the identified tenant would have been in effect; and (5) attorney's fees relating to the present case, which are allegedly owed under the Agreement.

S100 asserts that, after it attempted service at the Property, its process server, James McIntyre, received a call from Julia McDonough of McKenna Vane Property Management on October 14, 2021. According to an affidavit by McIntyre, McDonough told him that she was with the property management company representing Odili and that Odili had instructed her to accept service on his behalf. On January 20, 2022, McDonough was personally served, and she again represented that she was authorized to accept service on Odili's behalf. However, Odili has stated in a declaration that McDonough was not authorized to accept service on his behalf. In her own declaration, McDonough asserts that she instructed McIntyre to give her the documents so that the

2

tenants at the Property would not be disturbed. McDonough also denies that she was authorized to accept service on Odili's behalf.

On February 17, 2022, within 30 days after McDonough was served, Odili removed the action to this Court. Odili subsequently filed the pending Motion to Dismiss.

## DISCUSSION

In the Motion to Dismiss, Odili seeks (1) dismissal of this action under Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process or, in the alternative, quashing of service; and (2) dismissal under Rule 12(b)(6) of all claims for failure to allege sufficient facts to support a plausible claim for relief.

### I.      Rule 12(b)(5)

Odili first seeks dismissal under Rule 12(b)(5) or, in the alternative, to quash service, on the grounds that he was in Nigeria at the time of the filing of the Complaint, he was not served properly, and the service on McDonough, the property manager for the Property, was invalid because she was not authorized to accept service on Odili's behalf.

Federal Rule of Civil Procedure 12(b)(5) authorizes dismissal of a case for insufficient service of process. A plaintiff defending against a Rule 12(b)(5) motion bears the burden to demonstrate that service was adequate. *Scott v. Md. State Dep't of Labor*, 673 F. App'x 299, 304 (4th Cir. 2016) (citing *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010)); *see Danik v. Hous. Auth. of Balt. City*, 396 F. App'x 15, 16 (4th Cir. 2010). If a court determines that service of process is insufficient, the Court has broad discretion to determine whether dismissal under Rule 12(b)(5) is warranted. *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992). Dismissal is generally inappropriate "when there exists a reasonable prospect that service may yet be obtained." *Id.* Although the "plain requirements for the means of effecting service of process may not be

3

ignored," a "technical violation of the rule" or "failure of strict compliance may not invalidate the service of process" when a defendant has received actual notice of a case. *Armco, Inc. v. Penrod-Stauffer Bldg. Sys., Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984).

Odili asserts that at the time of service, he was in Nigeria. To properly effectuate service on an individual in a foreign country, a party must serve that person (1) "by any internationally agreed means of service that is reasonably calculated to give notice"; (2) "if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice" as specified in Rule 4(f)(2)(A)-(C); or (3) "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f). There is no dispute that Odili was not served by any of these means.

However, an individual may also be served "in a judicial district of the United States" by "delivering a copy" of the summons and the complaint "to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e)(2)(C). S100 asserts that it served McDonough, who was the current property manager for the Property, and that she stated that she was authorized to accept service, so service was proper under Rule 4(e)(2)(C). In contrast, Odili argues that service was not proper because McDonough was not authorized to accept service on his behalf. The Court must therefore decide whether service on McDonough constituted service on an agent of Odili within the meaning of the Rule 4.

### A. Agency Relationship

The Court first considers whether McDonough was an agent of Odili. "In an agency relationship, one person, the principal, can be legally bound by actions taken by another person, the agent." *Dickerson v. Longoria*, 995 A.2d 721, 735 (Md. 2010). Three elements are integral to the establishment of an agency relationship: (1) the agent is subject to the principal's right of

4

control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent has the power to alter the legal relations of the principal. *Broadway Servs., Inc. v. Comptroller of Maryland*, 272 A.3d 800, 809–10 (Md. 2022). On the issue of control, the agent "must be subject to the principal's control over the result or ultimate objectives of the agency relationship." *Id.* at 814.

Here, McDonough, as the property manager for the Property, was necessarily subject to Odili's control on issues relating to the Property itself and, in that capacity, had a duty to act primarily for the benefit of Odili. Similarly, as the property manager, McDonough had the power to alter Odili's legal relations as to the Property, such as by contracting for repairs or maintenance services. McDonough was thus Odili's agent.

## B. Authority

To accept service as Odili's agent, McDonough must also have been "authorized by appointment or law to receive service of process." *See* Fed. R. Civ. P. 4(e). The parties dispute whether McDonough had authority to accept service on Odili's behalf. In an affidavit, McIntyre, S100's process server, stated that after he attempted to serve Odili at the Property, McDonough called him, told him that she was with the property management company for the Property and represented Odili, and stated that he had instructed her office to accept service on his behalf. When McDonough was served personally and reviewed the documents, she stated again that she could accept service and that Odili had authorized her to do so. In contrast, Odili has submitted an affidavit from McDonough in which she acknowledges that she instructed the process server to give her the documents so that the tenants at the Property would not be disturbed, but she asserts that she did not state that she was authorized to accept service of process on behalf of Odili, and that Odili never authorized her to accept service on his behalf.

5

An agent may act with actual authority or apparent authority. *See Dickerson*, 995 A.2d at 735. Actual authority to do an act arises from "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Id.* While McIntyre's account, if true, would demonstrate that McDonough had actual authority to accept service, McDonough's account creates a factual dispute on this issue. The Court need not resolve this dispute because it finds that McDonough had apparent authority to accept service.

In the absence of actual authority, a principal may be bound by the acts of an agent when that individual has apparent authority to act on behalf of the principal. *Id.* An agent has apparent authority if: (1) the apparent principal created or acquiesced in the appearance that an agency relationship existed; (2) the plaintiff believed that an agency relationship existed and relied on that belief in seeking the services of the apparent agent; and (3) the plaintiff's belief and reliance were reasonable. *Bradford v. Jai Med. Sys. Managed Care Org., Inc.*, 93 A.3d 697, 707 (Md. 2014). The Court finds, based on McIntyre's account of McDonough's statement to him that she was authorized to accept service, that she had apparent authority to accept service. Even under McDonough's account of the events, where McDonough acknowledges that she requested that McIntyre provide her with the service documents to avoid disturbing the property's tenants, and thus caused McIntyre to stop his efforts once she was served, the process server had a reasonable belief that McDonough had authority to accept service and reasonably relied on that belief. Where Odili evidently later received the documents from McDonough but did not seek to clarify to McIntyre that McDonough actually lacked authority to accept service, he acquiesced in the appearance that McDonough had authority to accept service. Thus, under either version of events, McDonough acted with apparent authority, and Odili was properly served through her.

6

This conclusion is consistent with Maryland case law addressing similar circumstances. *See State v. Penn. Steel Co. of Philadelphia*, 91 A. 136, 140 (Md. 1914) (holding that a company that was the exclusive agent in Maryland for the defendant corporation could be deemed to have had the implied authority to receive service of process on behalf of the defendant). *Cf. Gordon, Feinblatt, Rothman, Hoffberger & Hollander v. Gerhold* (600 A.2d 1194, 1203 (Md. Ct. Spec. App. 1992) (noting that the defendant's secretary did not have implied authority to accept service on his behalf because she told the person serving the document that she was unsure whether she had authority to accept service).

Finally, the Court notes that "[w]hen there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service process." *See Armco, Inc.*, 733 F.2d at 1089. Here, Odili clearly obtained actual notice of the Complaint from McDonough and filed a notice of removal on February 17, 2022, approximately one month after service was effected on McDonough. Under these circumstances, and where McDonough had, at a minimum, apparent authority to accept service, the Court will deny the Motion as to the issue of improper service.

## II.     Rule 12(b)(6)

Odili also seeks dismissal of the breach of contract and unjust enrichment claims pursuant to Rule 12(b)(6) on the grounds that the Complaint fails to allege plausible claims for relief.

### A.     Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual

allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). The Court may therefore consider the Agreement and the emails attached to the Complaint. Courts are permitted to consider a document attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). With the Motion, the parties have submitted a "Joint Record" consisting of eight documents that cannot fairly be deemed to be integral to the Complaint. ECF No. 17. Thus, while these documents may be considered for purposes of the improper service argument pursuant to Rule 12(b)(5), they will not be considered for purposes of the Rule 12(b)(6) arguments. *See* Fed. R. Civ. P. 12(d).

### B.   Breach of Contract

The Complaint alleges a breach of contract based on the failure (1) to pay the renovation costs incurred by S100; (2) to pay 25 percent interest accruing on the unpaid renovation costs; (3) to accept a qualified tenant and to pay S100 a commission for finding that tenant; (4) to pay S100 management fees for time periods during which that tenant would have resided at the Property; and (5) to pay attorney's fees.

To establish a breach of contract under Maryland law, a plaintiff must prove "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that

obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). A court must "give force and effect to the words of the contract without regard to what the parties to the contract thought it meant or what they intended it to mean." *Hashmi v. Bennett*, 7 A.3d 1059, 1068 (Md. 2010) (internal citation omitted). Ultimately, a court interprets a contract by determining "from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.* at 1068–69.

### 1. Renovation Costs

S100 first alleges, citing paragraph 4 of the Agreement, a breach of contract based on Odili's failure to reimburse S100 for $23,456.61 that it advanced to pay for renovations to the Property. Paragraph 4(b) states, in relevant part, "Except as provided herein, Owner authorizes Agent and Agent agrees to perform necessary and proper maintenance, repairs, cleaning and decorations in and to the Property and the purchase of incidental supplies therefore at Owner's expense . . . Costs of repairs or replacement of appliances, hot water heaters, furnaces, and other repairs, replacements or improvements shall be billed to Owner at actual costs to Agent . . ." Agreement ¶ 4(b), Compl. Ex. A, ECF No. 2. Paragraph 4(c) reads, in relevant part, "Except in the event of emergencies, expenditures exceeding $100 will be made by Agent only after being authorized to do so by Owner." *Id.* ¶ 4(c). S100 argues that these provisions, read together, entitle S100 to reimbursement for all funds advanced to perform renovations in 2019. S100 included as an exhibit to the Complaint an email exchange reflecting that, on January 21, 2019, Odili agreed to "go ahead with the renovation." 1/21/19 Email, Compl. Ex. B, ECF No. 2.

Although Odili does not contest that renovations occurred, he argues that while the Agreement authorizes S100 to conduct repairs and maintenance at his expense, it contains no provisions relating to renovations and thus does not require him to pay S100 for any renovation

9

costs. The Complaint does not provide details about the nature of the renovations of the Property paid for by S100. It is thus unclear whether the renovations at issue were covered by paragraph 4(b), particularly the term "improvements," which could be fairly construed to include at least certain types of renovations. Agreement ¶ 4(b). Construing the factual allegations in the Complaint in the light most favorable to the plaintiff, as is required at this stage, the Court finds that S100 has sufficiently pleaded a breach of contract claim arising from the alleged failure of Odili to reimburse S100 for authorized renovations.

### 2. Monthly Interest

S100 also alleges that, pursuant to the Agreement, Odili owes S100 interest in the amount of $175,924.50 on the unpaid principal balance of the renovation costs. Paragraph 4(e) of the Agreement reads, in relevant part:

> In the event that Owner, after having been given ten (10) calendar days' notice of monies advanced by Agent, fails to reimburse Agent for said monies advanced on Owner's behalf by Agent, Agent in Agent's sole election and discretion shall have the option to charge 25% per month interest on said unpaid balance . . .

Agreement ¶ 4(e). S100 argues that this provision applies to the advanced renovation costs paid pursuant to paragraph 4(b), which, as discussed above, states that the "[c]osts of . . . improvements shall be billed to Owner at actual contract costs to Agent plus a . . . fee for administrative work and supervision." *Id.* ¶ 4(b). Notably, paragraph 4(a) also contemplates that S100 will bill Odili for costs incurred, as it provides that "Agent is authorized to have . . . equipment repaired and deduct the cost from Owner's funds, if sufficient, or Owner will reimburse Agent promptly upon request from agent." *Id.* ¶ 4(a). Similarly, paragraph 4(c) contemplates reimbursements from Odili to S100, as it authorizes S100 to conduct emergency repairs and provides that "charges for the same shall be billed to Owner." *Id.* ¶ 4(c).

Odili, however, argues that the interest provision of paragraph 4(e) applies not to all of paragraph 4, but only to paragraph 4(d), which provides that:

> If Owner requests and authorizes Agent to make payments on the trusts or mortgages secured by the Property, Owner will keep the account funded with Agent in an amount sufficient to cover the monthly costs of the trusts, mortgages, or expenses on the Property. Agent agrees, upon request and authorization by Owner, to make timely payments on any trust or mortgage secured by the said Property in accordance with a schedule of payments and account numbers supplied by Owner to agent; provided, however, that there are sufficient funds immediately available in Owner's account with Agent for such purpose. Agent will not be expected nor obligated to advance or disburse any money, or any money owed as compensation to Agent for services hereunder for such purpose nor shall Agent be liable in any way to Owner for the default or any consequences thereof in the terms of any trust or mortgage. Agent in its sole discretion may make payments on said trusts or mortgages in the event that there is a deficiency, but is under no obligation to do so. If at any time, for any reason, there is a deficit in Owner's account with Agent, Owner shall reimburse Agent within ten (10) calendar days of notice of said deficit. Owner expressly consents to said payments being advanced and made by Agent without Owner's prior approval. If reimbursement is not made to Agent within the ten (10) calendar day period, then this Agreement may be terminated in the sole discretion of Agent upon written notice to Owner.

*Id.* ¶ 4(d). Where paragraph 4(e) immediately follows paragraph 4(d), and paragraph 4(d) is the only preceding subparagraph within paragraph 4 referencing monies that will be the subject of an "advance" or will be "advanced," thus mirroring some of the language used in paragraph 4(e), Odili has offered a plausible interpretation of the Agreement as limiting the 25 percent interest charge to funds advanced to make payments on trusts and mortgages.

However, this interpretation is not the only reasonable one. Where paragraphs 4(a), 4(b), and 4(c) all reference scenarios under which the Owner may be required to reimburse the Agent for funds it paid in advance for expenses relating to the Property, it would be reasonable to conclude that the interest provision in paragraph 4(e) applies to all such situations. In particular, if the parties intended for the interest provision to apply only to funds advanced for payments on trusts and mortgages pursuant to paragraph 4(d), they could have and likely should have included

11

the interest provision within paragraph 4(d) itself, rather than as a freestanding subparagraph which, based on its positioning, could fairly be viewed as applying to all parts of paragraph 4. Alternatively, the parties could have explicitly stated within paragraph 4(e) that it applies only to the advanced payments referenced in paragraph 4(d), but no such language exists.

Where there are multiple reasonable interpretations of the applicability of the interest provision in paragraph 4(e), the Court finds that the language of the Agreement is ambiguous on the issue of whether S100 is entitled to monthly interest at a rate of 25 percent for funds advanced for the renovations. If a contract is ambiguous, such as "when the intent of the parties and the purpose of" the contract "cannot be divined from the actual language," the court may turn to extrinsic evidence of the parties' intent. *City of Bowie v. MIE, Props., Inc.*, 922 A.2d 509, 523 (Md. 2007). Because at this early stage, before discovery, the record is incomplete on what the parties' intentions were on this issue, the Motion will be denied as to the claim that Odili owes interest to S100 on the unpaid renovation costs.

S100's claim for unpaid monthly interest payments is also not subject to dismissal under Maryland usury laws. Under the statute cited by Odili, a "lender may charge interest at an effective rate of simple interest not in excess of 8 percent per year on the unpaid principal balance of a loan if there is a written agreement signed by the borrower which sets forth the stated rate of interest charged by the lender." Md. Code Ann., Com. Law § 12-103 (West 2017). Odili correctly notes that the yearly interest rate on unpaid balances owed to S100, as set forth in the Agreement, is well in excess of this limitation. However, the statute further provides that: "Any person who violates the usury provisions of [the statute] shall forfeit to the borrower the greater of: (i) three times the amount of interest and charges collected in excess of the interest and charges authorized by this subtitle; or (ii) the sum of $500. *Id.* § 12-114. Thus, the remedy for a violation of the cited

Maryland usury law is payment of a penalty and the effective reduction of the interest rate, not dismissal of a claim for recovery of unpaid interest. Accordingly, the fact that the interest rate appears to violate a Maryland usury law does not warrant dismissal of this claim.

### 3. Leasing Fee

S100 next alleges that Odili breached the Agreement by failing to pay a $7,500 leasing fee or commission, consisting of one month's rent, when S100 secured a ready and willing tenant who was prepared to lease the Property on the terms listed in the Agreement. Paragraph 7 of the Agreement states that "Owner agrees to pay Agent a leasing fee" of 100 percent of the first month's rent. Agreement ¶ 7. Paragraph 7 further provides that "Owner agrees to pay said leasing fee and/or additional leasing fee when a tenant has been obtained who is ready, willing and able to lease the Property on the terms and conditions set forth herein or any variance from those terms to which Owner may agree." *Id.* The stated terms include monthly rent of $4,000, a lease term of one year, a $4,000 security deposit, and a maximum of five occupants. *Id.* ¶¶ 1-2. S100 alleges that it obtained a ready, willing, and able tenant to lease the Property on the stated terms.

Although Odili argues that the Court should infer that the prospective tenant was rejected for seeking a three-year lease, that fact is not in the Complaint, and such an inference would be inconsistent with the requirement that, on a motion dismiss, the Court must draw all inferences in favor of the nonmoving party. *See Lambeth*, 407 F.3d at 268. Accepting S100's allegations as true, as is required at this stage, S100 has pleaded with sufficient specificity that Odili breached the Agreement by failing to pay the leasing fee when S100 found a ready, willing, and able tenant. The Motion will be denied as to this claim.

### 4. Property Management Fees

S100 further asserts that Odili breached the Agreement by failing to pay monthly property management fees for the period of time that the identified ready, willing, and able tenant would have occupied the Property had Odili accepted that tenant. Paragraph 8 of the Agreement reads: "Owner covenants and agrees to pay as compensation for the property management services of Agent (in addition to the leasing fee and additional leasing fee) a fee of 8% of all gross rentals collected by Agent per month." Agreement ¶ 8. While paragraph 7, relating to the leasing fee, requires a payment upon the securing of a ready, willing, and able tenant to lease the Property, paragraph 8 contains no language stating that S100 is entitled to monthly property management fees in the event Odili rejected a ready, willing, and able tenant. Furthermore, the Agreement provides that the property management fee is calculated as "8% of all gross rentals collected by Agent per month," *id.*, but S00 does not allege that any rent was actually collected from the ready, willing, and able tenant, so there was no rental income upon which to calculate the eight percent fee. The Court therefore finds that the plain language of the Agreement does not require payment of the monthly property management fees sought by S100 and will grant the Motion as to this claim.

### 5. Attorney's Fees

Finally, S100 asserts that, as part of the breach of contract claim, Odili owes S100 attorney's fees arising from the present action. S100 cites paragraph 34(e) of the Agreement, entitled "Indemnification of Agent," which states that:

> Owner does . . . release, indemnify, acquit, exonerate, discharge and hold harmless Agent . . . of and from all and every manner of action and actions, causes of actions, suits, debts, dues, sums of money, costs, including reasonable attorney's fees, accounts, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, claims, and demands, whatsoever, directly or indirectly, at law or in equity, for any failure of Owner to perform or satisfy any of the

14

requirements of provisions of the Federal Act or the Maryland Program; Agent's management of the Property; or any allegations of lead poisoning.

Agreement ¶ 34(e). This provision, however, falls within paragraph 34, which is entitled "Lead Paint" and which relates entirely to the issue of the possible presence of lead paint in the Property, including compliance requirements. *Id.* ¶ 34. In light of its placement within this section, the plain reading of this clause reflects that it indemnifies S100 against third-party claims related to lead paint poisoning or a failure to comply with requirements relating to addressing the presence of lead paint, but that it imposes no obligation on Odili to reimburse S100 for attorney's fees it incurs for its own first-party claims against Odili relating to alleged violations of contractual terms unrelated to lead paint, such as the non-payment claims asserted in the Complaint. The Motion will therefore be granted as to the claim for attorney's fees.

### C. Unjust Enrichment

In Count 2, S100 alleges a claim of unjust enrichment relating to the renovation costs and the funds expended on leasing and marketing services used to secure the prospective tenant. A claim of unjust enrichment has three elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007).

Generally, an unjust enrichment claim is not available when a contract exists between the parties relating to the same subject matter on which the unjust enrichment claim is based. *Cnty. Comm'r of Caroline Cnty. v. J. Roland Dashiell & Sons*, 747 A.2d 600, 607 (Md. 2000); *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 608 (D. Md. 2015) (finding that a plaintiff could not recover under quantum meruit or unjust enrichment theories in the face of an

15

express contract, the scope of which covered the subject of plaintiff's unjust enrichment claims). However, a plaintiff may plead breach of contract and unjust enrichment claims in the alternative, where the existence of a contract addressing the subject matter is in dispute. *See Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d. 785, 792 (D. Md. 2002). Contrary to Odili's claim, there is no requirement of fraud or bad faith relating to the contract in order for an unjust enrichment claim to proceed "when the express contract does not fully address" the relevant subject matter. *Dashiell*, 747 A.2d at 609. Notably, elsewhere in the Motion, Odili specifically argues that renovations are not a subject of the Agreement. *See supra* part II.B.1. Where there is at least a fair argument that renovations fall outside the scope of the Agreement, S100 may plead unjust enrichment as an alternative theory for recovery of the money spent on renovations, in the event that the Court concludes that renovations are not within the scope of the Agreement.

As for whether S100 has successfully pleaded the elements of an unjust enrichment claim relating to the renovation costs, S100 has alleged that it conferred a benefit upon Odili consisting of the renovations and improvements to his property. *See Everhart v. Miles*, 422 A.2d 28, 31 (Md. Ct. Spec. App. 1980) (finding that the plaintiff's repairs and improvements to the defendant's property constituted a benefit for purposes of unjust enrichment). By attaching an email in which Odili stated that "we should go ahead with the renovation," S100 has asserted facts supporting the inference that Odili had knowledge of the benefit and chose to accept it. 1/21/19 Email; *see Hill*, 936 A.2d at 354 ("The essence of the requirement that the defendant have knowledge or appreciation of the benefit is that the defendant have an opportunity to decline the benefit."). Finally, viewing the allegations in the light most favorable to S100, the Court finds that they support the conclusion that it would be unjust to permit Odili to retain the benefit of the completed

renovations without compensating S100. *See Hill*, 936 A.3d at 355 (finding that in assessing the third element, the court considers the facts in the record and the reasonable inferences drawn from those facts, considered in the light most favorable to the non-moving party). The Court will therefore deny the Motion as to the unjust enrichment claim relating to the renovation costs.

However, to the extent that the unjust enrichment claim is also based on S100's expenditure of funds on marketing the Property to secure a ready, willing, and able tenant, the Court finds that the subject matter of such expenses is directly addressed in paragraph 7 of the Agreement, which specifies what financial benefit S100 will receive for its efforts to find a tenant for the Property. Because the subject matter of such a claim is covered by the Agreement, the Court will grant the Motion as to any unjust enrichment claim seeking compensation for leasing or marketing activities.

## CONCLUSION

For the foregoing reasons, Odili's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. On Count 1, breach of contract, the Motion will be granted as to the claims relating to the failure to pay monthly property management fees and the failure to pay attorney's fees and will be otherwise denied. On Count 2, unjust enrichment, the Motion will be granted as to any claim relating to leasing and marketing costs and will be otherwise denied. A separate Order shall issue.

Date: October 6, 2022

THEODORE D. CHUANG
United States District Judge